Next case is Philips-Rothenberg v. ASSOCIATE REGIONAL, numbered 2010-1401. If it please the Court, I am Robert Fish for Philips-Rothenberg, and with me is Josh Emery. I would like to direct my opening comments to what we perceive as improper adverse inferences taken by the trial court, and then save the remaining time for answering questions and rebuttal. As far as BRI can see it, the trial court made several inferences that were improper for two reasons. One, they were adverse to responding party on summary judgment motion. And two, they were unreasonable as being inconsistent with unchallenged facts. I think I can go through this fairly quickly. There are five adverse inferences I want to address with respect to the 681 patent. And there are two adverse inferences I would like to address with respect to the 425 patent. Number one on the 681 patent is that the trial court treated claim 2, which is the only independent claim at issue, as a genus claim. And the significance of being a genus claim was that it would require additional or enhanced written description to satisfy the scope of a broader claim. In fact, there is only evidence of one member of that genus. And so we believe that the proper inference would be to have treated this as either a degenerate genus claim or not a genus claim at all. Number two, the trial court appeared to infer that Dr. Rothenberg, the inventor on the 681 patent, was not in possession of the mutation, the C282Y mutation, because in two years of looking, he apparently couldn't find the mutation. And Dr. Fetter, in another laboratory, took a long time to find the mutation. There's a couple of things wrong with that as an inference. One is that the facts, the undisputed facts, are that Dr. Rothenberg didn't have the adequate equipment to do it, even after two years, and he didn't even get his lab running at all for a year. And that Dr. Fetter, we have no idea how many people actually worked on it or how long it actually took. The fact that he didn't publish for two years doesn't tell us how long it took. So the adverse inference that they were unable to find the reference because it was outside the scope of one of ordinary skill is improper. Besides, those are simply anecdotes. And as far as I can tell, the plural of anecdote is not evidence. The one evidence that is factual is that Dr. Hashimoto, a Japanese researcher, did in fact rely upon the teachings and did mention the teachings of the 681 patent, and he was able, using the consensus sequence, which was the strategy proposed by Dr. Rothenberg, he was able to find the mutation. And he published almost exactly the same time as Mr. Fetter. Number three, the trial court appeared to make an adverse inference that the knowledge in the field was insufficient to find mutations when others had used the same techniques. In fact, what we know from the patent application is that Dr. Rothenberg had purchased beta-2 knockout mice, and from knowing that, it's clear that those skilled in the art knew how to find mutations, they knew how to knock out genes, and they knew how to find the gene. And what we pointed out in our brief was that the teachings of Dr. Rothenberg, taken in consideration with the teachings of those skilled in the art, was that there were 300 base pairs. He had narrowed it down to 300 base pairs out of 3 billion. If you consider that in light of humans on the earth, there's about 6 billion people on the earth. So that's like finding, you have to find a single individual among the 6 billion people. That's necessarily impossible. But if you can narrow it down to 600 people, which is the same ratio, all lined up together, you just test one person after another until you find the one with the condition that you're looking for. Number four, the trial court inferred that the structural features disclosed were too imprecise. Our argument has always been that knowing where the mutation is, the location, is the structure. It's undisputed, and there's a reference in the reply brief, that there are only 6 non-classical class 1 MHC genes on the short arm of chromosome 6. And knowing the location is knowing the structure. Number five, the last one on this point, is that the trial court, we believe, improperly inferred that work done on mice, which was on the beta 2 knockout mice that was disclosed in the specification, was not relevant to humans. It didn't really show that Dr. Rothenberg was in possession of the invention with respect to humans. Mr. Fisher, your time is up. Yes, Your Honor. Thank you. Mr. Cannon. Good morning. May it please the Court, my name is Brian Cannon. I represent the defendants in this case. The trial court, the district court, was entirely correct in its ruling on summary judgment that the asserted claims of the two patents are invalid. The first patent, the 681 patent, was filed in 1994, and the trial court correctly found that those asserted claims failed the written description requirement of the statute and of this Court's en banc decision in Ariadne. I would like to say... Is that a determination that was made on the basis of Claim 1 claiming a genus or a species? It was Claim 2, I believe, of the 681 patent. It was a genus claim, although whether it's characterized as a genus claim or not a genus claim is not dispositive of the decision. At the time of this patent filing, 1994, neither the gene nor any mutations for hemochromatosis had been identified in the contemporaneous prior art or in the patent specification itself. That is undisputed on this record. There was no deposit that was made? No deposit was made. This case would not fall under the ENSO exception, where a cell deposit might meet the written description requirement. There is no exception to the written description requirement that this case meets because of what was known in the art or not known in the art and what was not disclosed in the specification. But your view is under Eli Lilly, the fact that the gene wasn't sequenced is enough to render the failure to satisfy written description? That is correct, Your Honor. In fact, this case is even worse in terms of the facts, in terms of the amount of disclosure than the Eli Lilly case because at least in the Eli Lilly case, I believe there was some species that were disclosed. I believe there were rats' cDNA. However, in this case, there's absolutely no species disclosed. The gene was not isolated, the gene was not sequenced, and then one level below that, not even the mutations in question that would be within the gene were isolated or sequenced. What if the gene wasn't sequenced but it could have been sequenced the very next day? Suppose, in fact, it was. Suppose the day after, in fact, someone sequenced it. Would then we still have a written description problem because on the day the patent was filed, the sequence wasn't yet known? Well, I think there would be a problem, but I think under the written description analysis, I think the temporal time frame of this makes a difference. If this was today, 2011, where, for instance, the Human Genome Project has sequenced the entire genome, maybe we have a different case, but this case was filed in 1994. At that time, the gene was entirely unknown, the mutations were entirely unknown, and, in fact, it took, as a matter of hindsight fact, several years for the actual gene and then the mutations to be found. So I think it's critical under written description to have the invention in hand, to be in possession of the invention, not just to have an idea or a research plan to go and look for the invention because that's what this patent disclosure discloses. It does not disclose the mutation. It does not disclose structural features of the DNA itself, which is required under this Court's case law. Would you suggest that that's what differentiates enablement from written description? Enablement allows for experimentation, but written description does not. I think that's correct, John. Enablement can encompass some amount of experimentation, just not undue experimentation, and the way I think of it is maybe some experiments I needed to sort of optimize the assay or optimize the compound that's been claimed. However, written description requires proof or disclosure that the inventor had in his or her possession the actual invention, and in terms of a genetic test or a DNA invention, that requires a description of the DNA itself, and I think that's a critical legal point. The DNA itself must be described, not a plan about how to obtain the DNA using subsequent experiments, and I think that's the fatal flaw in the 681 patent, is the best that the plaintiff can say, and this is the absolute best with expert testimony, is that they identify an approximate location within the human genome where the mutation might have been found if further experiments were conducted, and I submit that is simply not enough under the court's written description precedent. You must be in possession of the actual invention. That might be a good segue to patent 425 as far as the reference 130 is concerned. Was that properly enabled? Your Honor, yes, it was enabled, and as a preliminary... It's not really an issue. It's not really an issue because the standard for enablement for an anticipatory reference is actually different and lower than enablement for under 112, and I believe the case is Rasmussen v. Smithkline-Beacham that points out the actual enablement analysis is different. It does not have to be enabled. The prior art, excuse me, anticipatory reference does not have to be enabled in the same manner as a claim under 112 that's submitted to the patent office. But go ahead and try and precisely define the distinction for me because I know that I'm struggling to understand. Well, I would say... Understand how the real difference exists in application. Theoretically in application, I would say we don't need to reach that on the facts of this case because if one looks at the 130 patents... I'm not trying to distinguish. You're telling me that enablement's a lower bar for anticipatory references, but what I'm suggesting is I can't figure out exactly... What that bar might be. Yeah. How it might differ from the normal bar. Well, I know that this court's precedents say the bar is different, the bar is lower. You are not incorrectly stating our precedents. And I would submit that the method that's disclosed, if you teach the method, this is a method claim, I would say the bar is one need not... I guess I'm put on the spot having to come up with a theoretical distinction that makes sense. Is there a requirement for a reference that it must be enabled and disclosed? I believe... Or is written description sufficient under Ariadne today? Is there a difference for references, prior art references, as in this case? Well, I think Ariadne certainly holds that there is two separate requirements under the statutory, under 35 U.S.C. 112, written description and enablement. And Ariadne was, of course, applied to a claim that was being asserted. When looking at a prior art reference, I think under the anticipation, under Section 102, if one wants to say, does that prior art anticipate? Is that invention in the public domain prior to the claimed invention? I'm not sure the case law looks at a separate enablement and written description requirement. And I'm not sure that one would not be necessary or appropriate to analyze. After Ariadne, does the reference have to be both describing it and enabling it? Or is it just description sufficient? I would think in that context, a prior art reference, I would think, and this is hypothetical because I think this reference actually needs both. Hypothetically, I think if it simply describes the invention in a manner that precedes whatever is claimed later on is enough because prior art doesn't have to be a patent. Prior art could be a publication or actually an actual device, like a 102G device that's out there, an invention that's out there in the marketplace, in the public domain. So the requirements of Section 112 are directed to what is in the four corners of the patent. And so that's not fully, I think, appropriate standard or analysis for the world of prior art or the world of things that could constitute prior art. I think it's a useful analysis to think about in terms of looking at a reference, but I don't believe that 112, which is applied to the contents of patents, is not necessarily appropriate to analyze the content of prior art. Isn't the distinction in enablement with respect to a prior art reference the fact that utility need not be shown? That is correct. If the prior art reference does not have to fully say, here's exactly the full usefulness of the invention, I think that is plaintiff's argument on appeal in this case, that our prior art reference, the reference that we pointed to, they say does not fully understand or recognize the usefulness of the method that's disclosed. Suppose that the anticipatory reference says, well, this mutation in this gene can be identified, but it is completely useless in identifying patients with HH. It has no utility as such, and so therefore you shouldn't do it. And it's not just a teaching away, because I know for anticipation that's not necessary, but what if a reference tells you something expressly will not work? I realize you're going to say that's not what this reference says, and that's fine, but what about those? I think at the very, very far end of the spectrum, there may be a case where the prior art is so absolutely undercutting the disclosure that potentially it could render the reference not anticipatory. I'm not sure what hypothetical facts that would encompass. I know in this case, this Court's precedent, for instance, in the Seleritis case, the proposed solution was, the language was, this may not be feasible. And then in the Bristol-Myers-Squibb case, that the drug, the anti-cancer drug, was found in the first clinical trials to not be effective. Now, neither of those cases took the, I would think, of an extreme position to say do not use this, or this absolutely won't work. And as Your Honor pointed out, that's actually not the facts of our case. Our facts, I think, fall squarely within the Seleritis case and the Bristol-Myers-Squibb case. But the method is disclosed. It is a mutation in the hemochromatosis gene. It's not a mutation in some random gene in some other part of the human genome. The entire 130 patent is directed to the hemochromatosis gene and to methods for screening for mutations within that gene. So I imagine you spent a long time pondering these sentences on column 19. What do you think they mean? The clinical, that one sentence or those two sentences on column 19, that refers to the clinical data that may not be established at the time of this patent filing. It may not be established, but it's reported with percentages down to intensive percentages. So it seems that the clinical data has been acquired and is being reported. Well, that's the clinical data to date, the date this was filed. So the invention was made in the prior art. The patients on which it was tested, that data was reported. And then on the basis of that data, there is that one line in column 19 that says, may not show or does not show an increased risk. Now, that doesn't preclude using the invention. That just says on the basis of the patients that we have tested or that we have found, it has not shown an increased risk. That doesn't say it won't work. Don't use it. It's not operable. That's a reference to the clinical data. And, in fact, if you look at the 130 patent as a whole, in other portions of the 130 patent it certainly does suggest, teach, and disclose using the S65C mutation as part of a diagnostic assay, a genetic testing assay, to diagnose those with a genetic susceptibility to hemochromatosis. Well, even if it clearly teaches a way under our holdings, where would it still apply? It would still apply, Ironic. Teaching away and even disparaging the invention is simply not applicable for anticipation. If it was obviousness, we might engage in a debate about how strong was the teaching away, but for anticipation, once the method, once the assay for detecting the mutation is disclosed, whatever teaching away happens is not applicable under the Celeridis case and others like that. I suspect that's one of the differentiations between written description and enablement at that point. Because if you're teaching away from it, you wouldn't try to enable it. Why would you enable a position that is teaching away from the invention? I suppose it's how you define teaching away, because one could enable an invention and describe all the reagents and the parameters and the temperature for doing the experiment and exactly how much sample to use. That would be a fully enabled method, a fully enabled assay or genetic test. And then one might say, oh, I don't think it's a very good idea to use this test after fully enabling it. So I think something could be fully enabled, fully described, and then there might be a teaching away within the reference. Although, as you point out, Judge, teaching away is not relevant for anticipation, which is what we have here. Thank you, Mr. Chairman. Thank you. Your Honor, the appellees just argued that, among other things, there were no gene sequences at the time of the filing of the application.  If the Court will turn to the Joint Appendix A5137 and 5138, the paragraph bridging those two pages. And this was addressed in our reply brief. There is evidence in the case, a declaration by Dr. Rothenberg. I'm sorry, where are you? I'm sorry. A5137. My appendix goes from A250 to A7C. There's two volumes. I'm off by an order of magnitude. Where are those two pages? The paragraph bridging those two pages, and specifically on A5138, starting on line one. It should be pointed out that some of the MHC Class I heavy chain genes had already been sequenced at the time of filing of the 681 patent. So the statement by the opposing counsel that none of the genes had been sequenced is completely inconsistent with the facts of the case. And also, as I pointed out in my opening statement, that the fact that people had found that Dr. Rothenberg was able to buy on the market Beta 2 knockout genes, or Beta 2 knockout mice, meant that they must have known where the gene was, and they must have known enough of the sequence to be able to knock it out. Secondly, with respect to the Eli Lilly case, perhaps the appellant is wrong in this, but as we read Ariad, it is not necessary to have a specific genetic sequence. It's only necessary to have some structure and some function, sufficient structure and sufficient function. And I think we addressed that quite a bit in our brief, that there was structure. Dr. Rothenberg knew the mutation was in the Alpha 3 domain of the protein. It was known in the field at the time that Alpha 3 domain of the protein corresponded to the Exon 4 of the gene. And so therefore, we did know where it was, and we knew it within 300 base pairs, as I mentioned before. So this business of saying that the trial court correctly found that we did not have the exact sequence, that statement is correct, but it's not determinative. The relevant law is Ariad, not Lilly. With respect to the third point, enablement allows for experimentation, but written description does not. Certainly the Federal Circuit will evolve on this issue of what's written description and what is enablement, but from at least what we can tell, that would eliminate the written description requirement. Written description is whether or not the inventor was in possession of the invention, whether those of ordinary skill in the art would have perceived that the inventor was in possession. It's not necessary actually for the written description to have shown exactly how to do it, because if that were the case, then there would be no distinction between written description. The written description would be subsumed by the enablement argument. Well, as I understand your opposing counsel, his argument isn't that it was necessary for you to show how to do it, but show that you actually possessed it. Yes. And there is no evidence that you actually possessed the sequenced gene. I understand your point is you don't think under the precedent you need to have the sequenced gene, but if you do need to have the sequenced gene, if he's right about that, then his argument, as I understand it, is you have to show you possess it. Well, and I understand what Your Honor is saying, and I agree with that statement, and I would say that even under that standard, there's only six genes that could possibly satisfy, and it was known at the time there was only six genes that could possibly code for the heavy chain of the MHC in the short arm of chromosome 6, which is exactly what it said in the specification. And even one of the claims, I think it was claim 8, specifically talks about the alpha-3 domain. So working backwards, it should have been clear to those of ordinary skill in the art, maybe not to the rest of us, but those of ordinary skill in the art who knew that the alpha-3 domain corresponded to the exon 4, and it had to be one of those genes, and therefore everyone agrees that it was narrowed down. One of the problems with trial counsel is claim 8 wasn't originally filed. So claim 8 can't be any of your written description support. Well, we don't have to rely on claim 8 because that same description is elsewhere, and maybe while I'm talking, my counsel here can find it. But in any event, it... Well, I'll address that when he finds it, but it's in the specification. I do want, since I have a few minutes left, I'd like to address the 130 pattern, if I may. We agree that enablement is not an issue here, and neither is teaching away an issue. What we're saying... You never raised enablement below. Yes, and we're not saying it's an issue. What we're saying... You're not appealing to that particular issue, right? What we're saying is that the... You're appealing to that particular issue. You're not discussing enablement. We're not discussing enablement. Enablement is not part of the rule. Right. We think enablement is beside the point on the 130 patent. We're saying that the 130 patent did not teach what was claimed. The defendants and the appellees in this case seem to treat the claim as if we're claiming an assay to find a mutation. We're not claiming an assay to find a mutation. We're claiming a method of diagnosing a disease, and that was not disclosed. All they disclosed in the 130 patent, they found the mutation, they disclosed a method of testing for the mutation, and they disclosed a method of determining whether that mutation has any clinical significance. And they concluded that it doesn't have clinical significance. Now, they left open the possibility that for something it might have clinical significance on some theoretical basis. But, again, I get back to the inference point. This case, the posture of this case, is that BRI has lost on summary judgment. And on summary judgment, all the inferences, reasonable inferences, have to be made in favor of the appellant in this case. And the inference, given from the phrase, there's no increase in risk, and the inference from the phrase that they may have clinical significance, the proper inference on a summary judgment, where we're the defending side, is that what they meant by that in the 130 patent is that they had concluded there's absolutely no clinical significance. And if there's no clinical significance, how could they possibly have anticipated the idea that someone could use that mutation for clinical significance? But the district court, Mr. Fisher, found that the 130 patent disclosed a diagnostic test. And that's correct. It did disclose a diagnostic test. For hemopneumatosis. But the... I don't want to interrupt you, but they did disclose a diagnostic test. There's a phrase in the 130 patent, I don't know exactly where it is, where they refer to it, along with other things, as a diagnostic test. But the way they used it as a diagnostic test, and the way ARUP and Bio-Rad used it as a diagnostic test, was to find a false positive. When they were running these primers, they would come up with positives, and then the person wouldn't have hemochromatosis. And so it was diagnostic for not having hemochromatosis. It wasn't diagnostic for having hemochromatosis. So it couldn't be used, from what the prior art knew, it could not be used to find someone with hemochromatosis. It was merely a false positive. And that's the sense in which they used it as a diagnostic. A diagnostic to help determine an error in their testing, not a diagnostic to find someone with hemochromatosis. So it's just word games. It's an unfortunate use of words. But again, the inference, the reasonable inference, as to how that should be interpreted, from my understanding of the law, at least, has to go in favor of the appellant, on the posture which we have now, which is summary judgment. Underwritten description, but not enablement of 130. As I mentioned, we don't care about enablement of 130. Well, you argued it. You presented it to this court as an argument of appeal that 130 was not enabled. Well, if the court wants to consider that argument, fine. And if the court doesn't... Well, you waived it because you didn't raise it to the law. Then it was waived. But the point is that it doesn't matter whether it's enabled or not. It didn't... The 130 patent didn't teach what is claimed. It taught... So we don't have to worry about teaching away. It simply didn't teach using the mutation to diagnose, and that's what's claimed. Thank you. Thank you, Mr. Chair. Case is submitted.